UNITED STATES of America,
Plaintiff,

v.

TWENTY ONE THOUSAND DOLLARS ($21,000) IN UNITED STATES POSTAL MONEY ORDERS AND SEVEN HUNDRED EIGHTY–FIVE DOLLARS ($785.00) IN UNITED STATES CURRENCY, Defendant.

No. CIV. 02–40098.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 17, 2003.

Rita E. Foley, Thomas A. Capezza, United States Attorney's Office, Detroit, MI, for United States of America, plaintiff.

Federal Defender, Federal Defender Office, Flint, MI, R. Steven Whalen, Detroit, MI, for Luis Cruz Espinosa, claimant.

### ORDER DENYING MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

Before the Court is Plaintiff's motion for summary judgment. For the reasons stated below, the Court will deny Plaintiff's motion.

### I.  BACKGROUND

Plaintiff, the Government, has instituted this civil forfeiture proceeding against $21,000 in Traveler's Express Money Orders and $785 in United States currency ("Defendant property"), as proceeds of illegal drug transactions forfeitable under 21 U.S.C. § 881(a)(6). Claimant Luis Antonio Cruz–Espinoza ("Cruz") has claimed an interest in Defendant property and contests forfeiture. Defendant property was found in the possession of Cruz and seized when he was arrested in Michigan for being in the country illegally, on November 7, 2001. Cruz later pled guilty to Reentry of Removed Alien under 8 U.S.C. § 1326.

Claimant Cruz was born in Veracruz, Mexico, on September 10, 1973. Cruz has five felony convictions, including four violations of the Georgia Controlled Substances Act involving possession of cocaine with intent to distribute (two in June 1999 and two in May 1997), as well as a conviction for carrying a concealed weapon (June 1999). Cruz was also deported from Georgia twice in 1998. On three occasions, Cruz provided authorities with aliases and false birth dates.

Cruz claims to have worked at a variety of jobs in the United States. From 1995 to 2000, he states that he was employed at "various odd jobs in auto scrap yards." In 2001, Cruz rented a garage, obtained a business license from the City of Rome, Georgia, and opened an auto repair shop named "Carlos Shop."

Cruz claims to have legitimate sources of income from these endeavors. Although Cruz could not recall exactly how much income he earned between 1995 and 2000, he estimated that he earned approximately $5,000 per year. Cruz also testified to earning approximately $30,000 in 2001 from the operation of Carlos Shop. During 2001, Cruz's expenses included monthly commercial rent in the amount of $350, assorted tools purchased for $3,000, parts and supplies, and personal living expenses. Cruz testified that he had no employees at Carlos Shop and did the work on his own, so he did not pay wages during the operation of the shop. Cruz also claims that he purchased a truck for approximately $800–850 in 2001. Cruz has not filed personal or corporate taxes. Cruz claims that when he applied for his

business license he was told that he did not have to file corporate taxes for two years.

Cruz opened a bank account with Greater Rome Bank in August 2001. Bank records indicate two large deposits made within minutes of each other on August 29, 2001: one of $5,000 and another of $3,500. When asked about the deposits, Cruz explained that before he began to trust banking institutions, he habitually carried large sums of cash on his person. On the August 29, he apparently had cash in separate bundles of $5,000 and $3,500. He deposited the $5,000, and then decided that it would be "for [his] benefit" to also deposit the $3,500 and did so. On September 4, 2001, Cruz liquidated the account and received a customer service check in the amount of $10,032.86.

Cruz claims that he then drove to Michigan with $21,000 in cash. On September 10, 2001, Cruz and two cousins purchased twenty-one $1,000 money orders from a liquor store, apparently dividing the money amongst themselves and going through the line several times each, purchasing "up to three" money orders per trip. When asked during deposition why he did not purchase money orders in larger denominations, Cruz testified that he wanted to purchase larger denominations so that he would not have to fit so many in his wallet, but that "they only sold $1,000 [denominations]." Ex. C at 43–44. Cruz also stated that the maximum amount that could be exchanged at a time was $3,000. When asked about his intentions regarding the money orders, Cruz testified that he was considering opening a shop in Michigan, or perhaps returning to Mexico with the money to help needy family members.

According to the *Traveler's Express* Anti–Money Laundering Guidelines, Federal law mandates the filing of "Suspicious Activity Reports" for "any transaction or pattern of transactions that is attempted or conducted with at least $2,000 that [the issuers of the money orders] know, suspect, or have reason to suspect ... is structured to avoid recordkeeping or reporting requirements." Ex. J at 17. The name and address of the purchaser must be logged from valid identification for cash purchases of money orders in the amount of $3,000–$10,000. *Id.* at 10. A "Currency Transaction Report" must be filed with the Internal Revenue Service for cash transactions of amounts greater than $10,000. *Id.* at 12. The record does not indicate that any reports were filed as a result of the transactions conducted on September 10 by Cruz and his two cousins.

Cruz testified that one or two weeks after September 10, 2001 he purchased a plane ticket from Detroit to Georgia, and flew on the day of purchase, though he could not remember the name of the airline. The Government notes that this flight occurred only a few weeks after the tragic events of September 11, 2001. In Georgia, while still illegally in the country, Cruz testifies that he married Elizza Syconda Hill. He stated that he returned to Detroit by Greyhound bus shortly thereafter to retrieve his truck and tools. Cruz was arrested in Michigan on November 7, 2001, for being in the country illegally. Defendant property was seized at that time.

As to the source of the $21,000 in money orders and $785 in United States currency, Cruz testified that roughly $11,000–$12,000 came from the liquidated account with Greater Rome Bank. The proceeds from the sale of Carlos Shop constituted another $5,000. Cruz, however, could not remember the date of the sale, the buyer's name, or the name of the buyer's attorney who facilitated the sale. Cruz did not produce supporting documentation of the sale, although he claims that a contract of sale, drafted by the buyer's attorney, was in his

vehicle at the time of his arrest. Cruz claims that another $4,000–$5,000 came from money he had saved outside of the bank over time. Finally, Cruz testified that the remaining $785 came from the sale of his tools.

The Government filed a complaint seeking forfeiture of the $21,000 in money orders and the $785 in currency as "moneys and/or other things of value furnished or intended to be furnished in exchange for controlled substances or which constitute proceeds traceable to such an exchange," pursuant to 21 U.S.C. § 881(a)(6). Cruz filed a claim against forfeiture. The Government subsequently filed the motion for summary judgment presently before the Court.

## II. DISCUSSION

### A. Legal Standards

#### 1. *Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435–36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.; Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted); *see Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548;

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990) (Gadola, J.), *aff'd,* 929 F.2d 701, 1991 WL 49687 (6th Cir.1991). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *see Cox v. Ky. Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir.1995).

### 2. Burden of Proof under 21 U.S.C. § 881(a)(6)

The Government brings this action pursuant to 21 U.S.C. § 881(a)(6). This section provides for the forfeiture of

> [a]ll moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this title, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this title.

21 U.S.C. § 881(a)(6). The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") "heightens the Government's burden" of proof in forfeiture actions. *United States v. $99,990.00 in United States Currency,* 69 Fed. Appx. 757, 762 (6th Cir.2003) (unpublished opinion). CAFRA "applies to forfeiture proceedings commenced on or after the date that is 120 days after its enactment." *Id.* CAFRA "was enacted on

April 25, 2000," and "120 days after that date was August 23, 2000." *Id.* (citation omitted). Since this action commenced on April 16, 2002, the provisions of CAFRA apply.

■ CAFRA states that "the burden of proof is on the Government to establish, by a *preponderance of the evidence,* that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1) (emphasis added). This standard replaces the standard that required only a demonstration of probable cause. *$99,990.00 in United States Currency,* 69 Fed. Appx. at 762. In meeting its burden, the Government is not required to demonstrate a direct connection between Defendant property and the illegal activity. *United States v. Veggacado,* 37 Fed. Appx. 189, 190 (6th Cir.2002) (unpublished opinion); *United States v. $174,206.00 in United States Currency,* 320 F.3d 658, 662 (6th Cir.2003) (finding burden of proof satisfied by lack of evidence of legitimate income alone).

CAFRA also states that "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). In the complaint, the Government states that the property "is forfeitable ... as moneys and/or other things of value furnished or intended to be furnished in exchange for a controlled substance or constitutes *proceeds traceable to such an exchange." Id.* at ¶ 7 (emphasis added).

■ The Sixth Circuit has stated in an unpublished decision that 21 U.S.C. § 881 "authorizes forfeiture for 'all proceeds traceable' to an exchange for a controlled substance. Accordingly, *the Government*

*need not prove a substantial connection to a specific drug transaction when it advances a drug proceeds theory." United States v. $118,170.00 in United States Currency,* 69 Fed. Appx. 714, 717 n. 1 (6th Cir.2003) (unpublished) (citations omitted, emphasis added). Although this is an unpublished decision, the Court agrees with the conclusion of the Sixth Circuit. In this case, the Government advances a theory that Defendant property constitutes the proceeds of a drug transaction. Accordingly, the Court will not require the Government to demonstrate a substantial connection between this property and a specific drug transaction.

In their briefs, both the Claimant and the Government have referenced the "innocent owner" defense available under 18 U.S.C. § 983(d). The "innocent owner" defense allows a party with an interest in property that is subject to forfeiture an opportunity to prove that the party's interest in the property is innocent. Specifically, a party can demonstrate that he is an "innocent owner" by showing either that (1) he "did not know of the conduct giving rise to forfeiture," or (2) that, after having learned of the property's connection to illegal activity, he "did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2).

In this case, Cruz has not tried to show that he did not know about a connection between Defendant property and the illegal activity or that he tried to stop any illegal use of Defendant property. Rather, Cruz attempts to demonstrate that Defendant property is legitimate property that is unconnected to any illegal transactions. Accordingly, the "innocent owner" defense is not applicable to this case.

## B. Analysis

At the outset, Claimant argues that the Government failed to seek concurrence in the motion in accordance with Local Rule 7.1. *See* E.D. Mich. LR 7.1(a). Specifically, Claimant's counsel states that the Government's counsel left a message with his secretary at approximately 11:10 a.m. on April 7, 2003, seeking concurrence in the motion for summary judgment. Claimant's counsel returned the call approximately one hour later. In that call, the Government's counsel allegedly did not explain the motion's legal basis, as required by the Local Rules and the Policies and Procedures of this Chamber. The Government states in reply that Claimant's counsel refused concurrence during that conversation, as the Government stated in its motion. Claimant does not appear to contest that the Government sought concurrence. Claimant instead argues that the content of the conversation seeking concurrence was inadequate.

Without further investigation into this conversation, it is unclear whether the rules and procedures followed by this Court have been violated. Regardless, Local Rule 1.2 provides that "[f]or good cause shown, for a particular matter, any Judge of this Court may temporarily suspend the operation of the Rules." E.D. Mich. LR 1.2. In this case, Claimant's opposition to the motion demonstrates that there is no concurrence in the motion. Furthermore, efficiency would be served by adjudicating the motion. The Court will therefore apply Local Rule 1.2, temporarily suspend the requirement of the local rules for this particular matter, and address the motion on the merits.

The Government argues that the facts, taken as a whole, prove by a preponderance of the evidence that Defendant property is subject to forfeiture. Specifically, the Government argues that evi-

dence of (1) Cruz's prior convictions, (2) use of aliases, (3) the manner in which he and his cousins purchased the $21,000 in money orders, and (4) his lack of reported income sufficient to explain the large amount of money seized, when viewed in the aggregate, rises to a preponderance of evidence in favor of forfeiture. The Government also argues that Cruz's explanations as to the legitimacy of Defendant property are so insufficient as to warrant a finding that he cannot prevail in this action as a matter of law. The Court weighs the evidence to determine if any genuine issues of material fact exist, or if the evidence is so one-sided as to warrant a grant of summary judgment in favor of the government.

### 1. *Cruz's Prior Convictions*

Cruz's criminal history record indicate four convictions on felony counts of violations of the Georgia Controlled Substances Act. Under the previous standard, evidence of prior drug trafficking activity was held to be a "highly probative factor" in a determination as to the sufficiency of probable cause for forfeiture. *United States v. $67,220.00 in United States Currency,* 957 F.2d 280, 286 (6th Cir.1992). Cruz's prior drug convictions, do constitute some evidence suggesting a connection between Defendant property and illegal drug transaction. This evidence alone is insufficient to show a connection by a preponderance of the evidence.

### 2. *The Use of Aliases*

Cruz's arrest records and testimony indicate that he has used a variety of aliases in the past to conceal his identity from authorities. The Government has stated in its brief that evidence of the use of aliases may be considered probative evidence which may tend to indicate a connection between seized property and illegal drug transactions. *See United States v. $100,000,* 761 F.Supp. 672, 676 (E.D.Mo. 1991); *United States v. $46,559.00 in United States Currency,* 758 F.Supp. 613, 614–615 (D.Or.1990). The cases cited by the Government in support of this proposition, however, are distinguishable from the instant action insofar as the use of aliases in those cases arose in direct connection with the property seized. The record here does not allege that Cruz's use of an assumed name in connection with his November 2001 arrest and the seizure of Defendant property. No cases have been cited which support the use of past, unconnected instances of the use of aliases as evidence to connect Defendant property with illegal drug activity. Therefore, Cruz's prior use of aliases, insofar as they have no connection to Defendant property, is insufficient to show a connection.

### 3. *The Amount of Money Orders and Cash*

The Sixth Circuit has held that "fifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity." *United States v. $5,000 in United States Currency,* 40 F.3d 846, 850 (6th Cir.1994) (internal quotation and citation omitted). In this case, Defendant property constitutes $21,785 in cash and money orders. This amount of money, in accordance with the Sixth Circuit reasoning, does not by itself "justify more than a suspicion of illegal activity." *Id.* Additionally, Defendant property was not kept in a "distinctive manner" that indicates drug related activity, such as large bundles of rubber-banded cash or plastic wrapping. *$99,990.00 in United States Currency,* 69 Fed. Appx. at 763. In fact, money orders would seem less suspicious than cash.

The Government argues that the manner in which the money orders were pur-

chased is sufficient evidence of the connection to illegal activity. The Government argues that the transaction was structured to avoid detection. Specifically, the Government notes the division of funds between different purchasers, the relatively small denomination of the orders, and the fact that each purchaser made several transactions, each only purchasing up to three orders per trip. The government argues that such a transaction was possibly aimed at avoiding the need for valid identification or the filing of official transaction reports.

Cruz's deposition testimony on the matter, however, indicates innocent reasons for this manner of purchase. Cruz believed that the money orders could only be purchased in denominations of $1,000 or less. Cruz also claimed that the maximum amount of money that could be exchanged in a single transaction was $3,000. If Cruz's testimony in this regard is to be believed, it alleviates much of the suspicion surrounding the transactions. Even the assistance of his cousins can be viewed as an effort to effect the purchase of all the money orders in a more efficient manner than if Cruz were made to go through the line several times himself. Indeed, the fact that no "suspicious activity reports" were filed as a result of the purchases made by these three men in one day could support Cruz's claims of innocence.

The Government has not shown that money orders could be purchased in denominations greater than $1,000 or that single transactions could exceed $3,000 at that particular vendor. The Government has instead provided a copy of the *Traveler's Express* Anti–Money Laundering Guidelines. This document does not provide evidence of the events in this case. Rather, it explains the guidelines vendors must follow to curb money laundering. The guidelines do not mention a require-

ment that vendors make denominations higher than $1,000 available to purchasers, and so do not contradict Cruz's testimony. Furthermore, the Court notes that, for the purpose of summary judgment, the evidence must be viewed in a light most favorable to Cruz.

Even assuming that Cruz and his cousins were structuring their purchases to avoid reporting or identification requirements, such evidence does not establish a connection between Defendant property and illegal drug activity. Individuals can structure transactions for a variety of reasons, such as to avoid taxes or to conceal their status as an illegal alien. The appearance of a structured transaction admits of too many plausible interpretations in this context to demonstrate a connection between Defendant property and illegal drug activity by a preponderance of the evidence.

#### 4. *Lack of Reported Income*

■ Reported income insufficient to explain the presence of a large sum of money may constitute evidence of a connection between that money and illegal activity. The Sixth Circuit has held that unrebutted evidence of insufficient income does satisfy the Government's burden of proof in certain contexts. *See, United States v. $174,206.00 in United States Currency,* 320 F.3d 658, 662 (6th Cir.2003). Evidence of the presence of a large sum of money, though clearly insufficient standing alone to warrant forfeiture, may be highly probative. *See, United States v. $67,220.00 in United States Currency,* 957 F.2d 280, 286 (6th Cir.1992). As noted above, however, $21,785 is not a sufficiently large sum of money as to warrant a suspicion of illegal activity. *$5,000 in United States Currency,* 40 F.3d at 850.

Furthermore, Cruz has offered evidence that the funds seized were legitimate.

Cruz testifies to roughly $11,000 as proceeds of business at Carlos Shop withdrawn from an account at the Greater Rome Bank (actually $10,032.86), $5,000 from personal savings never deposited in a bank, $5,000 from the sale of Carlos Shop, and $785 from the sale of some tools. This evidence raises a genuine controversy with respect to a material fact in this case: the legitimacy of the funds seized.

### 5. *Viewing these facts together*

■ Even when all of these facts are viewed together, the Government has not established that there is no genuine issue of material fact. Cruz has presented a coherent, plausible version of the facts that suggests that Defendant property is legitimate income. Furthermore, the Court notes that no drugs or drug paraphernalia was found with Defendant property, further distancing the money from a connection with illegal activity. The Government, in its motion for summary judgment, has argued that such evidence is "implausible," and therefore cannot demonstrate that the funds came from legitimate sources. The Court does have some discretion to gauge the plausibility of evidence. *See Street v. J.C. Bradford*, 886 F.2d 1472, 1480 (6th Cir.1989). As the Court in *Street* discussed, this discretion does not include the freedom to decide the credibility of evidence when not implausible. *Id.* at 1480, n. 21.

The Court does not consider Cruz's evidence to be implausible. The evidence suggests that Cruz owned a licensed business known as Carlos Shop. The customer history of Advance Auto Parts suggests that Carlos Shop did actual business during 2001. It is plausible that Cruz earned profits from the operation of this business. No evidence has been proffered to support the contention that $30,000 is an impossible figure for yearly income from a business of this type without additional employees. Additionally, Cruz offered a plausible explanation for the manner of his deposits at the bank and the purchases of the money orders, the credibility of which must be judged by the trier of fact.

It is plausible that Cruz was able to save roughly $15,000 ($10,000 in the Bank and $5,000 on his person) from his profits, even in light of his admitted expenses. Cruz's claim of earning $5,000 from the sale of Carlos Shop, though undermined by his lack of documentation and spotty memory of the events, is similarly plausible. The sale of Carlos Shop could be consistent with Cruz's testimony that he planned to start up a shop in Michigan, or return to Mexico. It is likewise plausible that the sale of a small business for a relatively small amount of money may have occurred with as little ceremony as Cruz claims. Similarly, Cruz's testimony regarding the sale of his tools for $785 is plausible. Since Cruz has offered plausible rebuttal testimony against the Government's evidence, a genuine issue of material fact exists. The requirement that the Court view the evidence in a light most favorable to the nonmoving party requires submission of this matter to a trier of fact.

## III. CONCLUSION

The Court will deny the Government's motion for summary judgment in this matter for the reasons stated above. The Government has not, for the purposes of summary judgment, met the burden of demonstrating that there is no genuine issue of material fact concerning the connection between Defendant property and illegal activity.

**ACCORDINGLY, IT IS HEREBY ORDERED** that the Government's motion for

summary judgment [docket entry 18] is **DENIED.**

**SO ORDERED.**